1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JAVIAD AKHTAR,                                No.  2:09-cv-2733 MCE AC P

12                    Plaintiff,

13          v.

14    J. MESA, et al.,                              FINDINGS AND RECOMMENDATIONS

15                    Defendants.

16

17          Plaintiff, a state prisoner proceeding with counsel, seeks relief pursuant to 42 U.S. § 1983.

18    On October 29, 2014, the court held a hearing on defendant's motion for summary judgment

19    (ECF No. 108).  Carter White, supervising attorney for the University of California at Davis King

20    Hall Civil Rights Clinic, appeared for plaintiff Javiad Akhtar with certified law students David

21    Ligtenberg and Cynthia Cheung.  Deputy Attorney General Diana Esquivel represented the

22    remaining defendant, former Correctional Lieutenant Larry Ward., Sr.  On review of the motion,

23    the documents filed in support and opposition, upon hearing the arguments of counsel, and good

24    cause appearing therefor, the court makes the following findings and recommendations:

25                          PLAINTIFF'S ALLEGATIONS

26          This case proceeds against former Mule Creek State Prison Correctional Lieutenant Ward

27    ////

28    ////

                                              1

on the second amended complaint (SAC).[1]  Plaintiff asserts three causes of action against defendant Ward: (1) deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment; (2) deliberate indifference to plaintiff's right to safe and adequate shelter in violation of the Eighth Amendment; and (3) and supervisory liability.  ECF No. 53.  Supervisory liability is a theory of vicarious liability rather than an independent cause of action.  Accordingly, the court construes plaintiff's third cause of action as presenting supplemental allegations in support of his alternate Eighth Amendment claims.

The SAC alleges in sum as follows:

Plaintiff is a Pakistani national with very limited proficiency in English, who suffers from numerous serious medical conditions including chronic kidney disease, traumatic brain injury, a spinal disc hernia, incontinence, coronary artery disease, hypertension, high cholesterol, and a history of seizures, stroke, and epilepsy.  Plaintiff's mobility is impaired, and he uses a walker and a cane.  He wears a special vest identifying him as hearing-impaired.  He wears special shoes for medical reasons and uses a medically-required double mattress.  Because of his incontinence, plaintiff requires ready access to a toilet.

On August 17, 2006, plaintiff was issued a Disability Placement Program Verification ("DPPV"), stating that he was mobility-impaired due to a permanent disability, and subject to housing restrictions of a lower bunk, no stairs, and no triple bunk.  On October 8, 2008, plaintiff was issued an accommodation chrono specifying that he was to be permanently housed in a ground floor cell, bottom bunk.

On December 2, 2008, former defendant Mesa, Building Officer in "B" Facility, told plaintiff that he was being moved from his cell to an emergency bunk ("E-bed") in open dormitory housing, which had forty E-beds but only two toilets and one urinal.  The order to move plaintiff to an E-bed was signed by defendant Ward, the supervising Lieutenant.  Plaintiff

---

[1]  Lt. Ward is deceased.  His successors in interest, Larry Ward, Jr., Robert Ward and Cherie Ward, have been substituted in his place.  ECF No. 77.  Defendants Turner and Mesa have been dismissed by stipulation, ECF No. 116, and plaintiff's motion to amend his complaint in order to add additional defendants has been denied, ECF Nos. 102, 107.

1  told Officer Mesa that he had a medical chrono showing he was to be housed in a ground floor

2  cell, and objected to the move on safety and medical grounds.  Mesa nonetheless insisted on

3  moving plaintiff, who then said he would rather go to administrative segregation (ad seg) than to

4  the open dormitory.  Plaintiff was taken to a holding area and informed by former defendant

5  Turner that he was being moved to the dormitory.  When plaintiff showed Sgt. Turner his medical

6  chrono, Turner stated, "I don't care" and told plaintiff he would be sent to ad seg and written up

7  for disobeying a direct order.  Plaintiff was charged with a rules violation (known as a CDC 115,

8  after the rules violation report form) and confined in ad seg for a week.  He was issued a second

9  rules violation report for his continued refusal to move, and then was moved to a triple bunk in

10  the open dorm setting.

11      In the open dormitory plaintiff did not have the medically necessary sleeping

12  accommodations.  His bed on the bottom of the triple-bunk was higher and narrower than the

13  bunk in his cell, the vertical space between the beds was smaller, and it was open on both sides

14  rather than one.  The bunk lacked the double mattress that plaintiff required for accommodation

15  of his disability.  As a result of these deficiencies, plaintiff fell from his bed and broke his wrist.

16  His bunk was also 75 feet away from the nearest urinal.  Because this distance made it difficult

17  for plaintiff to access the urinal, he repeatedly urinated in his clothing.  As a result plaintiff

18  suffered humiliation, anxiety and emotional distress.  His access to necessary medication was also

19  impaired in the dorm because of the misconduct of other inmates, who repeatedly moved and

20  sometimes stole his personal property.  Plaintiff seeks money damages.  SAC, ECF No. 53.

                        MOTION FOR SUMMARY JUDGMENT

22      Defendant moves for summary judgment under Rule 56 of the Federal Rules of Civil

23  Procedure on the grounds that Ward (1) did not move plaintiff or cause him to be moved to a

24  housing assignment inconsistent with his medical needs; (2) had no knowledge plaintiff suffered

25  any adverse effect from being housed in an emergency bed; and (3) is entitled to qualified

26  immunity.  Motion for Summary Judgment (MSJ), ECF No. 108.

27      Plaintiff opposes the motion, arguing that (1) circumstantial evidence shows that Ward

28  was deliberately indifferent to plaintiff's serious medical need; (2) Ward's deliberately indifferent

1   conduct set in motion a series of acts by which plaintiff was deprived of his constitutional rights,

2   making Ward responsible under a theory of supervisory liability; (3) Ward is not entitled to

3   qualified immunity because his conduct violated a clearly established constitutional right.  Opp.,

4   ECF No. 112.

5       I.       <u>Legal Standard for Rule 56 Motions</u>

6         Summary judgment is appropriate when the moving party "shows that there is no genuine

7   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

8   Fed.R.Civ.P. 56(a).  Under summary judgment practice, the moving party "initially bears the

9   burden of proving the absence of a genuine issue of material fact."  <u>In re Oracle Corp. Securities</u>

10   <u>Litigation,</u> 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323

11   (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the

12   record, including depositions, documents, electronically stored information, affidavits or

13   declarations, stipulations (including those made for purposes of the motion only), admission,

14   interrogatory answers, or other materials" or by showing that such materials "do not establish the

15   absence or presence of a genuine dispute, or that the adverse party cannot produce admissible

16   evidence to support the fact."  Fed.R.Civ.P. 56(c)(1)(A), (B).

17         When the non-moving party bears the burden of proof at trial, "the moving party need

18   only prove that there is an absence of evidence to support the nonmoving party's case."  <u>Oracle</u>

19   <u>Corp.</u>, 627 F.3d at 387 (citing <u>Celotex</u>, 477 U.S. at 325); <u>see also</u> Fed.R.Civ.P. 56(c)(1)(B).

20   Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

21   against a party who fails to make a showing sufficient to establish the existence of an element

22   essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>See</u>

23   <u>Celotex</u>, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the

24   nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u>  In such a

25   circumstance, summary judgment should be granted, "so long as whatever is before the district

26   court demonstrates that the standard for entry of summary judgment . . . is satisfied."  <u>Id.</u> at 323.

27         If the moving party meets its initial responsibility, the burden then shifts to the opposing

28   party to establish that a genuine issue as to any material fact actually does exist.  <u>See</u> <u>Matsushita</u>

4

1  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

2  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

3  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

4  admissible discovery material, in support of its contention that the dispute exists.  See

5  Fed.R.Civ.P. 56(c)(1); Matsushita, 475 U.S. at 586 n. 11.  The opposing party must demonstrate

6  that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under

7  the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec.

8  Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir.1987), and that the

9  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

10  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir.1987).

11       In the endeavor to establish the existence of a factual dispute, the opposing party need not

12  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

13  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

14  trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

15  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

16  Matsushita, 475 U.S. at 587 (citations omitted).

17       "In evaluating the evidence to determine whether there is a genuine issue of fact," the

18  court draws "all reasonable inferences supported by the evidence in favor of the non-moving

19  party."  Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is

20  the opposing party's obligation to produce a factual predicate from which the inference may be

21  drawn.  See Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), aff'd,

22  810 F.2d 898, 902 (9th Cir.1987).  Finally, to demonstrate a genuine issue, the opposing party

23  "must do more than simply show that there is some metaphysical doubt as to the material facts....

24  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

25  party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

26  ////

27  ////

28  ////

5

II.      Undisputed Facts

The parties expressly agree that the following facts are undisputed,[2] or the record before the court so demonstrates.

- Plaintiff Javiad Akhtar was incarcerated at Mule Creek State Prison (MCSP) from 2002 to 2011.

- During his incarceration at MCSP, plaintiff had several medical conditions, including chronic kidney disease, incontinence, and back pain, for which he was receiving medical care, medication, and medical devices.

- As a result of his chronic kidney disease, plaintiff experienced the urge to urinate, the inability to urinate, and had blood in his urine.  ECF No. 112-2 at 10-11,[3] Deposition of plaintiff Javiad Akhtar, 43:10-44:2.

- Plaintiff's painful and frequent urination started in 2004 and increased in 2008.  He had to urinate 13 to 14 times per hour, and would experience pain associated with this condition every day.  ECF No. 112-2 at 12-13, plaintiff's Dep. 45:14-46:15; ECF No. 112-2 at 135-138, 5/28.08, letter/diagnostic report to Dr. Smith from physicians at UC Davis Department of Internal Medicine, Division of Nephrology.

- Plaintiff also suffers from diabetes, seizures, gout, brain injury, high blood pressure, and limited mobility.

- Plaintiff used a walker to move around, wore a hearing-impaired vest, had a medically required double mattress, and medical shoes.  ECF No. 112-2 at 134, 11/21/08 Comp. Accomm. Chrono.

- A Disability Placement Program Verification form (DPPV) was generated on August 17, 2006, stating that plaintiff was mobility-impaired with a permanent disability, subject to housing

---

[2]  See Defendants' Statement of Undisputed Facts (DSUF), ECF No. 108-1 and attached exhibits; see also, Plaintiff's Response to DSUF, ECF No. 112-1at 1-7 and supporting exhibits, as well as Plaintiff's Statement of Additional Disputed and Undisputed Material Facts, ECF No. 112-1 at 7-11; and see Defendants' Response to Plaintiff's Additional Facts, ECF No. 113 at 7-10.
[3]  Citations to court documents refer to the page numbers assigned by the court's electronic docketing system.

1   restrictions of a lower-bunk, no stairs, and no triple bunk, and in 2006, plaintiff was placed on the

2   Disability Placement Program with the specified restricted housing.  Motion for Summary

3   Judgment (MSJ), ECF No. 108-3 at 4, Exhibit A to Declaration of Diana Esquivel (DPPV form

4   dated 8/17/06).

5   •   The Disability Placement Program form was prepared by medical staff to verify an

6   inmate's physical disability.  The form was considered confidential and kept in the control booth

7   of the housing units.

8   •   A Comprehensive Accommodation Chrono (CDC 7410) was a form prepared and issued

9   by medical staff that specified the medical needs of the inmate.  The chrono was used by custody

10  staff to appropriately house the inmate based on the inmate's medical needs or limitations.

11  •   Custody staff did not have the authority to issue or change accommodation chronos.

12  Nor were they involved in generating the chronos.

13  •   On July 7, 2008, plaintiff was issued a Comprehensive Accommodation Chrono on

14  CDCR form 7410 signed by Dr. Hawkins.  This chrono specified that plaintiff be housed in a

15  ground floor cell, and in a bottom bunk.  The housing accommodation was approved by

16  reviewing medical staff, including Dr. Galloway, who cosigned the chrono as the healthcare

17  manager on July 8, 2008.  Opposition exhibit, ECF No. 112-2 at 140, attached to Declaration of

18  Carter White.

19  •   Another Comprehensive Accommodation Chrono for plaintiff dated October 8, 2008

20  was issued and signed by Dr. Ziomek.  Plaintiff's housing was again specified to be on a bottom

21  bunk in a "ground floor cell."  The chrono also noted that plaintiff required certain medical

22  appliances, including a walker.  ECF No. 108-3 at 2.

23  •   On October 8, 2008, in addition to issuing the medical chrono, Dr. Ziomek verbally told

24  plaintiff that he could not live in a dayroom or triple bunk.

25  •   On November 5, 2008, a Unit Classification Committee met for plaintiff's annual review.

26  The Committee decided that plaintiff did "not meet the criteria for gym housing."  The UCC

27  review also noted the 8/17/06 CDC 1845 regarding mobility impairment.  AGO 92.

28  •   Before December 2008, Dr. Galloway had treated plaintiff a few times for various

7

1  medical conditions.

2  • On November 21, 2008, plaintiff was seen by Dr. Galloway because he had felt dizzy

3  after dinner the evening before.  During this appointment, Dr. Galloway crossed out the word

4  "cell" from "ground floor cell" on a Comprehensive Accommodation Chrono and inserted the

5  word "housing" so that it became "ground floor housing."  He also ordered an extra sack lunch

6  and a renal diet for plaintiff.  ECF No. 108-14, plaintiff's Dep. 61:23-65:4; ECF No. 108-17,

7  Galloway Dep. 51:7-13; ECF No. 108-3 at 3, Nov. 21, 2008 Comp. Accom. Chrono, Ex. A to

8  Esquivel Dec.

9  • The November 21, 2008 chrono was approved and signed by the Chief Medical Officer

10 on November 24, 2008.  ECF No. 108-3 at 3, Chrono; ECF No. 112-2, plaintiff's Dep. 65:10-17.

11 • A form GA 154 was completed every time an inmate was moved to another bed

12 assignment and was required for purposes of tracking the inmate.  Deposition of Shawntel Turner,

13 ECF No. 108-16, 32:21-34:6; Deposition of Harold Hettema, ECF No. 108-21, 35:11-38:9,

14 45:13-46:4; CDCR Operations Manual § 52020.5.4 (2008), attached to Esquivel Dec. Ex. Q;

15 plaintiff's Resp. to DUF No. 14 (disputing only the responsible party for confirming the accuracy

16 of the information contained in the GA 154)).

17 • Any officer can generate a GA 154 for a bed move as long as the move is within the

18 same facility.  An officer-originated move would be approved by the sergeant, who is subordinate

19 to the lieutenant.

20 • Before a captain signs a GA 154, he would gather and review case factors of inmates

21 that are housed in the cell to find out who would be eligible for dorms.

22 • Medical chronos and Disability Placement Program Verification (DPPV) forms were

23 located in the inmate's Central file (C-file) in an organized format.

24 • Both the chronos and DPPV forms should be considered in inmate housing restrictions.

25 • The relevant information for a lieutenant's review of the appropriateness of a move should

26 be contained in the inmate's C-file.

27 • On December 2, 2008, defendant Lt. Ward signed the GA154 requiring plaintiff, among

28 other inmates, to move to an E-bed in the dayroom of Building 10.  Pl.'s Resp. to Defs.'

8

1   Statement of Undisputed Facts (DUF) No. 17, ECF No. 112-1.

2   • The dayroom is an open dormitory with E-beds.

3   • Later on December 2, 2008, Officer Mesa informed plaintiff that he was being move to an

4   E-bed, and ordered him to pack his belongings.

5   • Plaintiff refused to move and showed Officer Mesa his Comprehensive Accommodation

6   Chrono, dated October 8, 2008, which said he was required to be housed in a "cell."   Plaintiff

7   requested to speak to the sergeant.  Plaintiff did not show defendant Mesa his Disability

8   Placement Program form.   ECF No. 112-1, Pl.'s Resp. to DUF Nos. 19-21.

9   • Plaintiff was escorted to the Program Office, and he took his October 2008 chrono with

10  him.  In the Program Office, he spoke with Sgt. Turner and again expressed his unwillingness to

11  move to an E-bed because his chrono stated he needed a cell

12  • Plaintiff was placed in administrative segregation (ad seg) based on his continued refusal

13  to move to an E-bed.

14  • On December 9, 2008, while in ad seg, plaintiff was again given a direct order by to move

15  to an E-bed, but refused.  He remained in ad seg until December 15, 2008.  ECF No. 108-6, Rules

16  Violation Report No. C12/08-039 at 1, Ex D attached to Esquivel Dec.; ECF No. 108-12,

17  plaintiff's Bed Assignments, Ex. H to Esquivel Dec.;  ECF No. 108-14, plaintiff's Dep. 74:19-24,

18  Ex. J to Esquivel Dec.; ECF No. 112-1 at 5, Pl.'s Resp. to DUF Nos. 22-23.

19  • Plaintiff was assigned to an E-bed in Building 9 on Facility B from December 15, 2008

20  to June 4, 2009.

21  • There were 40 inmates housed in the dayroom to which plaintiff was assigned, and there

22  were two toilets and one urinal for the forty inmates.

23  • Plaintiff was assigned to a triple bunk where, although there no inmate was assigned to the

24  middle bunk, there was not enough room to accommodate plaintiff's medically required double

25  mattress, which he could only use on the floor.

26  • Plaintiff was placed in ad seg for unrelated reasons from June 4 to August 24, 2009.  He

27  was moved to an E-bed in Building 8 on Facility B on August 24, 2009 until June 28, 2010, when

28  he moved into a cell.

1    • Plaintiff had no interaction with defendant Ward on December 2, 2008, and he never

2    spoke with Ward about his assignment to an E-bed or any problems he was experiencing with

3    such assignment.

4    • While plaintiff was living in the dayroom:

5        - he fell from his E-bed, broke his wrist and had to wear a cast for 40 days;

6        - he urinated in his clothes a number of times when he was unable to reach the restroom

7    because of difficulty walking and long lines;

8        - his back pain became worse;

9        - inmates stole plaintiff's walker, medications, typewriter, shoes, and boom box on

10   multiple occasions.  ECF No. 112-2, plaintiff's Dep. 95:19-96:11, 97:15-22; 98: 18-22, 93:17-

11   94:13, 94:14-95:18, 89:12-24.

12   • From December 15, 2008 to December 26, 2008, plaintiff could not sleep in the triple

13   bunk because he had kidney problems and he could not move in the small space.  ECF No. 112-2,

14   plaintiff's Dep. 91:9-11 (W29).

15   • The twenty people on each side of the dayroom were restricted to using the toilet on their

16   side only.  ECF No. 112-2, plaintiff's Dep. 89:1-5 (W27).

17   • While on an E-bed, the bathroom was about 70 to 75 feet from plaintiff's bunk.  ECF No.

18   112-2, plaintiff's Dep. 93:17-94:13 (W31-32).

19   • Plaintiff still experiences pain from the broken wrist from the triple bunk fall, and cannot

20   straighten one finger.  Now he cannot wash his clothes or cook, he has little strength in his wrist.

21   ECF No. 112-2, plaintiff's Dep. 97:15-98:20 (W35-36).

22   II.    Facts in Dispute

23   • Whether Dr. Galloway's interlineation of the November 21, 2008 chrono, which changed

24   Plaintiff's "ground floor cell" restriction to a "ground floor housing" restriction, was standard

25   practice or a common occurrence.  MSJ, ECF No. 108-1 at 2-3, DUF No. 9; Opp., plaintiff's

26   response to DUF No. 9, ECF No. 112-1; Reply, ECF No. 113 at 10-11 & Esquivel Supplemental

27   Declaration ¶ 4.

28   • Whether doctors determined housing needs or merely made medical recommendations

1  and created minimum standards to be followed.  MSJ, ECF No. 108-1 at 3, DUF No. 10; Opp.,

2  plaintiff's resp. to DUF No. 10, ECF No. 112-1 at 3.

3      •   Whether Dr. Galloway changed plaintiff's accommodation chrono for medical reasons.

4  MSJ, ECF No. 108-1 at 3, DUF No. 11; Opp., plaintiff's resp. to DUF No. 11, ECF No. 112-1 at

5  3-4.

6      •   Whether placement on the UCC's list of inmates eligible for assignment to an E-bed was

7  sufficient to make inmates eligible for assignment to an E-bed.  MSJ, ECF No. 108-1 at 3, DUF

8  No. 13; Opp., plaintiff's resp. to DUF No. 13, ECF No. 112-1 at 4.

9      •   Whether the GA 154 dated December 2, 2008 was generated by the UCC or by Lt. Ward.

10  MSJ, ECF No. 108-1 at 4, DUF No. 15; Opp., plaintiff's resp. to DUF No. 15, ECF No. 112-1 at

11  4-5.

12      •   Whether or not Ward was the second-watch relief Correctional Lieutenant for Facility B

13  on December 2, 2008 when plaintiff was housed on Facility B, Building 10, cell 124,.  MSJ, ECF

14  No. 108-1, DUF No. 16 at 4; Opp., plaintiff's resp. to DUF No. 16, ECF No. 112-1 at 5.

15      •   Whether Dr. Galloway's November 21, 2008 chrono requiring a lower bunk on the

16  ground floor permitted a lower bunk E-bed assignment.  MSJ, ECF No. 108-1 at 6, DUF No. 29;

17  Opp., plaintiff's resp. to DUF No. 29, ECF No. 112-1 at 7.

18      •   Whether the phrase "gym housing," as used in the November 5, 2008 classification

19  committee memo stating that plaintiff "does not meet the criteria for gym housing," was generally

20  understood to encompass any housing other than a cell, whether in the gym or in the dayroom.

21  Opp. to MSJ, plaintiff's Additional Statement of Facts, Disputed and Undisputed (SOF) Nos. P2

22  & P30, ECF No. 112-1 at 7-8, 10; Reply, defendant's response to SOF Nos. P2, P30, ECF No.

23  113 at 7, 8.

24      •   Whether or not plaintiff's E-bed assignment on December 2, 2008 was part of a mass

25  move.  Opp., SOF No. P4, ECF No. 112-1 at 8; Reply, defendant's resp. to SOF No. P4, ECF No.

26  113 at 7.[4]

27  _____

28  [4]  Plaintiff seeks to distinguish plaintiff's move from a cell to an E-bed from one made as part of a
(continued…)

IV.   <u>Governing Eighth Amendment Principles</u>

In order to state a §1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendant possessed a sufficiently culpable state of mind. <u>Wilson v. Seiter</u>, 501 U.S. 294, 299 (1991); <u>McKinney v. Anderson</u>, 959 F.2d 853 (9th Cir. 1992). The requisite state of mind for a medical claim is "deliberate indifference." <u>Hudson v. McMillian</u>, 503 U.S. 1, 5 (1992). The same standards apply to an Eighth Amendment claim that prison officials deprived plaintiff of safe and adequate shelter. <u>See</u> <u>Anderson v. County of Kern</u>, 45 F.3d 1310, 1312 (9th Cir. 1995).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. <u>See, e.g.</u>, <u>Wood v. Housewright</u>, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); <u>Hunt v. Dental Dept.</u>, 865 F.2d 198, 200-01 (9th Cir. 1989). <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, <u>WMX Technologies v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), the Supreme Court established a very demanding standard for "deliberate indifference." Negligence is insufficient. <u>Farmer</u>, 511 U.S. at 835. Even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient to establish an Eighth Amendment violation. <u>Id.</u> at 836-37. It not enough that a reasonable person would have known of the risk or that a defendant should have known of the risk. <u>Id.</u> at 842. Rather, deliberate indifference is

---

larger move, in order to lend support to the position that Ward generated the list himself.   Opp., SOF No. P46, ECF No. 112-1 at 11; Reply, defendant's resp. to SOF No. P4 & P46,  ECF No. 113 at 7, 9.

1    established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to

2    inmate health and safety."  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal

3    citation omitted) (emphasis added).

4         A finding that an inmate was seriously harmed by the defendant's action or inaction tends

5    to provide additional support for a claim of deliberate indifference; however, it does not end the

6    inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the

7    medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

8    needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the

9    defendant."  McGuckin, 974 F.2d at 1061.

10   V.    Analysis

11        This case raises the important question whether officials at Mule Creek State Prison

12   responded to over-crowding by moving inmates into emergency housing in gyms and dayrooms

13   with inadequate regard for inmates' countervailing medical needs.  Plaintiff's experience presents

14   a troubling example of the health and safety problems faced by inmates with serious medical

15   needs in such dormitory-style emergency housing.  However, the only question before the court is

16   whether Lt. Ward deprived plaintiff of his right to safe and constitutionally adequate housing, and

17   did so with deliberate indifference to plaintiff's medical needs.

18        Defendant concedes for purposes of this motion that the objective prong of the alleged

19   Eighth Amendment violation (the seriousness of plaintiff's medical need) is satisfied.  Defendant

20   moves for summary judgment on three overlapping grounds: (1) that he did not cause plaintiff's

21   move to a housing assignment inconsistent with his medical needs, (2) that he had no knowledge

22   of medical needs inconsistent with a E-bed, and therefore cannot have been deliberately

23   indifferent, and (3) that he is entitled to qualified immunity.

24

25        A.    There Is A Material Factual Dispute Whether Defendant Ward Caused Plaintiff To Be
                Moved To A Housing Assignment Inconsistent With His Medical Needs

26             1.    Causation

27        "In a § 1983 action, the plaintiff must . . . demonstrate that the defendant's conduct was

28   the actionable cause of the claimed injury. . . .  To meet this causation requirement, the plaintiff

1    must establish both causation-in-fact and proximate causation."  Harper v. City of Los Angeles,

2    533 F.3d 1010, 1026 (9th Cir. 2008).  Defendant argues that the undisputed evidence fails to

3    support a causal link between Ward's issuance of a bed move order on December 2, 2008, and

4    plaintiff's eventual assignment to an E-bed on December 15, 2008.  Reply, ECF No. 113 at 3.

5    Plaintiff counters that "[b]ut for Ward's E-bed assignment, [plaintiff] would not have been

6    assigned to Administrative Segregation or to other E-beds afterwards."  Opp., ECF No. 17:1-2.).

7    There are really two issues here: (1) whether Ward's issuance of the GA 154, as opposed to the

8    UCC's inclusion of plaintiff in the list of inmates eligible for E-beds, was the initial "cause" of

9    the attempt to move plaintiff to an E-bed; and (2) whether the initial GA 154 signed by Ward can

10   be considered the "cause" of plaintiff's eventual move to an E-bed, following a term in ad-seg

11   and subsequent GA 154s.  For the reasons which follow, the court concludes that the facts

12   material to causation are disputed.

13            There is conflicting evidence – or at least evidence susceptible of conflicting inferences –

14   on the question whether Ward personally authored the GA 154 that he signed on December 2,

15   2008.  See Olivas Dep., ECF No. 112-2, 69:3-11 (W109) (indicating that Lt. Ward authored this

16   particular move); Deposition of John Mesa, ECF No. 112-2, 47:7-17 (W117) (reflecting

17   uncertainty as to whether Ward created or simply signed the GA 154); Hettema Dep., ECF No.

18   112-2, 36:2-5 (W78) (stating "[t]here's nothing saying that Lieutenant Ward didn't author [the

19   GA 154]").

20            There is conflicting evidence – or at least evidence susceptible of conflicting inferences –

21   on the respective roles of the UCC's eligibility list and Ward's authorization of the GA 154 in

22   initiating the E-bed assignment.  Plaintiff points to evidence that the Facility Lieutenant or

23   Sergeant is responsible for checking the accuracy of the information regarding any individual

24   inmate and confirming that the move is appropriate.  CDCR Operations Manual §52020.5.4

25   (2008),[5] ECF No. 112-2 at 131 (W123); CDCR Operations Manual §54046.4 (2008), ECF N0.

26   _____

27   [5]  The Department Operations Manual section on which plaintiff relies states, in relevant part:
     "All housing changes shall be accomplished by staff completing a GA 154 Inmate Transfer Form
     upon approval of Central Control.  Without exception, Central Control shall not accept a GA

28   (continued…)

14

1   112-2 at 132 (W124); Hettema Dep., ECF No. 112-2, 19:2-9 (explaining how housing moves are

2   based on case factors and custody level points), Hettema Dept. 25:17-21 (W77) (testifying that

3   "ultimately the lieutenant signs the 154, so it's ultimately his responsibility.").  This is sufficient

4   to support a conclusion that Ward was responsible for confirming the correctness of the GA 154

5   regardless of the UCC's role.

6         There is conflicting evidence – or at least evidence susceptible of conflicting inferences –

7   on the question whether Ward's authorization of the initial GA 154 was the "cause" of plaintiff's

8   eventual E-bed placement given intervening events.  When plaintiff refused to move to an E-bed

9   as ordered by Lt. Ward on December 2, 2008, he was placed in ad-seg.  On December 9, 2008,

10  plaintiff was again ordered to move to an E-bed.  That order was authorized by Officer Kalb, and

11  Sgt. Hernandez attempted to effect the move.  ECF No. 108-6, Rules Violation Report No.

12  C12/08-039.  Plaintiff again refused, and therefore remained in administrative segregation until

13  December 15, 2008, when he was moved to an E-bed in Building 9.  Defendant argues in essence

14  that the events and orders subsequent to Lt. Ward's GA 154 operated as superseding causes of the

15  December 15 placement.  However, a jury could reasonably conclude that subsequent orders

16  merely effectuated the initial E-bed assignment, initiated by Lt. Ward, which had been thwarted

17  by plaintiff's refusal to comply.  Subsequent orders consistent with Ward's initial GA 154 do not

18  constitute the sort of unforeseeable or unusual interventions that necessarily defeat proximate

19  causation.  See Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996) (applying

20  traditional tort law principles to proximate causation in § 1983 case).

21        In opposition to summary judgment, plaintiff casts his chain-of-events causation theory in

22  the alternative as a theory of supervisory liability.  ECF No. 112 at 17.  A supervisor may be

23  liable in a § 1983 case for the actions of subordinates if he "set in motion a series of acts by

24  others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably

25  should have known, would cause others to inflict the constitutional injury."  Larez v. City of Los

26  _____

27  Form 154 that has not been signed by the Facility Lieutenant/Sergeant or a higher classification.
    The Facility Lieutenant/Sergeant shall check the accuracy of the information and sign all copies."
    § 52020.5.4 .

28

1   Angeles, 946 F.2d 630, 646 (9th Cir. 1991).  Whether the issue is framed as one of supervisory

2   liability or proximate cause, independent of supervisory authority, the analysis is the same.  See

3   Van Ort, 92 F.3d at 837 (causation established where state actor sets in motion a series of acts by

4   others which he knows or reasonably should know, would cause others to inflict the constitutional

5   injury).  For these reasons, defendant is not entitled to summary judgment on causation grounds.

6                    2.      Inconsistency of E-Bed with Plaintiff's Medical Needs

7           Defendant argues that plaintiff has not produced evidence to support the claim that his E-

8   bed placement was inconsistent with his medical needs.  Relying on plaintiff's November 21,

9   2008 "clearance" by Dr. Galloway for ground floor housing, defendant contends that a dayroom

10  E-bed was not inappropriate.  Plaintiff counters that plaintiff's C-file was replete with

11  documentation of medical needs requiring ground floor housing in a cell, and precluding dorm-

12  style emergency housing.

13          Whether Dr. Galloway's November 21 interlineation of the disputed chrono was unusual,

14  or even procedurally improper, is not material.[6]  The question is whether the E-bed assignment

15  itself posed an excessive risk to plaintiff's health and safety.  See Toguchi, 391 F.3d at 1057.

16          The record contains conflicting evidence – or at least evidence susceptible of conflicting

17  inferences – on the question whether an E-bed was medically appropriate in plaintiff's case.  Dr.

18  Galloway testified that he changed the accommodation chrono because he concluded that plaintiff

19  did not require cell housing.  Galloway Dep., 59:1-2.  He also testified that the chrono was

20  changed as part of a policy to review all "ground floor cell housing" restrictions and change them

21  (where medically appropriate) to "ground floor housing" restrictions.  This policy change was a

22  response to overcrowding and the need to move as many inmates as possible out of cells and into

23  E-beds.  Galloway Dep., 51:14-54:24.  However, the record includes two other chronos for

24

25  _____
    [6]  Plaintiff relies on the declaration of an inmate clerk named Dustin Lujan, who states he had
26  never seen words crossed out on chrono before.  ECF No. 112-2 at 126-128, ¶ 11.  The parties
    dispute the admissibility of the Lujan declaration.  See Reply, ECF No. 113 at 10-11.  Because
27  what matters is the objective suitability of E-bed housing in light of plaintiff's medical needs, it is
    irrelevant whether the amendment of the chrono was unusual or procedurally proper.
28  Accordingly, the court does not address the evidentiary dispute.

                                                16

1    ground floor cell housing that were issued to plaintiff after this purported policy went into place.

2    ECF No. 112-2 at 140 (7/7/08 chrono signed by Dr. Hawkins); ECF No. 108-3 at 2 (10/8/08

3    chrono signed by Dr. Ziomek).[7]   The record contains no reference to any change in plaintiff's

4    medical condition following those chronos, and no contemporaneous documentation of a medical

5    rationale for the November 21 change to plaintiff's housing restriction.  Drawing all inferences in

6    plaintiff's favor, this inconsistency in the record supports the inference that the medical

7    recommendation was driven by custodial imperatives rather than medical considerations, as

8    plaintiff contends.

9         The parties dispute whether or not the November 5, 2008 UCC finding that plaintiff did

10   "not meet the criteria for gym housing" meant that he did not meet the criteria for *any* dorm-style

11   E-bed housing, and the evidence on this point is inconclusive.[8]   Neither the UCC's use of the

12   phrase "gym housing," however, nor other prison officials' interpretation of that UCC finding, is

13   material to the question whether a dayroom E-bed was medically contra-indicated.

14        Defendant points to the opinion of Dr. Galloway and the opinions of several custodial

15   officers that plaintiff's medical restrictions did not preclude E-bed placement as a matter of prison

16   policy, but plaintiff's well-documented medical problems and the undisputed facts regarding the

17   problems he encountered in the dormitory are sufficient to raise a triable issue regarding the

18   appropriateness of the placement.[9]   Accordingly, defendant is not entitled to summary judgment

19   on grounds plaintiff's E-bed placement did not jeopardize his health and safety.

20   ////

21   ////

22

23   [7]  The precise effective date of the policy is not clear from the record.  Dr. Galloway described the
     policy as being in effect by 2008.  The benefit of any doubt goes to plaintiff as the non-moving
24   party.
     [8]  Defendants present evidence that "the criteria for gym housing" referred to custody criteria
25   (other than medical considerations) that governed placement in E-beds in the gym as opposed to
     those in the dayroom.  Lamb Dep. 23:20-24:1; Olivas Dep. 49:4-12; Gutierrez Dep. 65:1-12, 19-
26   24.  Plaintiff points to the deposition of Lt. Hettema, who testified that gym housing referred to
     dormitory housing generally.  Hettema Dep. 55:24-56:25, 62:1-9.
27   [9]  It is undisputed, for example, that plaintiff was assigned to the bottom level of a triple-bunk in
     the dayroom, even though his 2006 DPPV stated no triple-bunks.
28

1

      B.  <u>Plaintiff Has Not Identified Evidence Sufficient To Create A Triable Issue Regarding Deliberate Indifference On The Part Of Lt. Ward</u>

2

3           Notwithstanding the existence of triable issues regarding causation and the

4  appropriateness of plaintiff's assignment to an E-bed, plaintiff may not proceed to trial if he lacks

5  an evidentiary showing sufficient to establish the existence of another element essential to his

6  case.  <u>See Celotex</u>, 477 U.S. at 322.  In order to establish defendant Ward's liability, plaintiff

7  must establish that Ward acted with a deliberately indifferent state of mind.  <u>Farmer</u>, 511 U.S. at

8  834.  The circumstantial evidence in this case does not fairly support an inference that Ward acted

9  with deliberate indifference to plaintiff's medical needs.[10]

10          Plaintiff argues that defendant Ward must have known when he signed the GA 154, based

11  on the medical documentation in plaintiff's C-file, that plaintiff's medical issues would be

12  incompatible with E-bed and dormitory housing.  However, even crediting plaintiff's theory that

13  Ward had an obligation to review the file and confirm the appropriateness of the move, the fact

14  remains that the most recent medical opinion in the file was Dr. Galloway's November 21, 2008

15  chrono changing the "ground floor cell" restriction to "ground floor housing."  That chrono had

16  been approved by the Chief Medical Officer on November 24, 2008.  Even if the physicians

17  responsible for altering and approving the chrono had erred in their assessment that a ground-

18  floor dormitory was appropriate for plaintiff, and even if that medical assessment had been

19  deliberately indifferent or rendered in response to a policy adopted with deliberate indifference to

20  the medical needs of inmates, it could not be fairly inferred that Lt. Ward shared that state of

21  mind.

22          The record presented here is insufficient to support a conclusion that defendant Ward

23  subjectively knew of and disregarded an excessive risk to plaintiff Akhtar's health and safety.

24  <u>See Toguchi</u>, 391 F.3d at 1057.  Under plaintiff's own theory, the record supports no more than

25  an inference of negligent deference to an invalid medical judgment.  Negligence is insufficient as

26

27  ——————————————
[10]  Plaintiff faces a significant hurdle in establishing the facts regarding Ward's state of mind, in that the defendant passed away before being deposed.

28

1   a matter of law to support liability under the Eight Amendment.  Farmer, 511 U.S. at 835.

2   Defendant is therefore entitled to summary judgment.

3           C.   Defendant Ward Is Entitled to Qualified Immunity

4           Even if there were a dispute of material fact regarding Lt. Ward's subjective knowledge of

5   plaintiff's medical needs, defendant would be entitled to qualified immunity.  The doctrine of

6   qualified immunity protects government officials from liability insofar as their conduct does not

7   violate clearly established rights of which a reasonable person would have known.  Pearson v.

8   Callahan, 555 U.S. 223, 231 (2009) (citations omitted).  Qualified immunity gives government

9   officials breathing room to make reasonable but mistaken judgments, and protects all but the

10  plainly incompetent or those who knowingly violate the law.  Ashcroft v. al-Kidd, 131 S. Ct.

11  2074, 2085 (2011) (citations omitted).  To resolve a claim for qualified immunity the court

12  addresses two questions: (1) whether the facts, when taken in the light most favorable to plaintiff,

13  demonstrate that the officer's actions violated a constitutional right, and (2) whether a reasonable

14  officer could have believed that his conduct was lawful, in light of clearly established law and the

15  information the officer possessed.  Anderson v. Creighton, 483 U.S. 635 (1987).  These questions

16  may be addressed in the order that makes the most sense given the circumstances of the case.

17  Pearson v. Callahan, 555 U.S. 223 (2009).

18          While it was certainly well-established in 2008 that prison officials other than medical

19  personnel had a duty to protect the health and safety of inmates, see Helling v. McKinney, 509

20  U.S. 25 (1993), the question here is whether a reasonable official in Lt. Ward's place would have

21  known that he had a duty to look beyond the most recent accommodation chrono and

22  independently investigate the medical appropriateness of a bed move.  The undersigned is aware

23  of no authority that imposes such a duty.  It was not unreasonable for Lt. Ward to rely on the

24  judgment of the medical doctors who had authored and approved the latest chrono.  Accordingly,

25  defendant is entitled to qualified immunity even if he was wrong.  For the reasons previously

26  explained in relation to the deliberate indifference inquiry, there is no basis for a conclusion that

27  Lt. Ward knowingly violated the law.  Accordingly, he is entitled to qualified immunity and

28  should be granted summary judgment on that ground.

19

1

CONCLUSION

2       Accordingly, IT IS HEREBY RECOMMENDED that defendant Ward's motion for

3  summary judgment (ECF No. 108) be granted, judgment entered for defendant and this case be

4  closed.

5       These findings and recommendations are submitted to the United States District Judge

6  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

7  after being served with these findings and recommendations, any party may file written

8  objections with the court and serve a copy on all parties.  Such a document should be captioned

9  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

10  objections shall be filed and served within fourteen days after service of the objections.  The

11  parties are advised that failure to file objections within the specified time may waive the right to

12  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13  DATED: December 9, 2014

14

ALLISON CLAIRE
15  UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28